UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT SARVIS,
        Plaintiff,


        v.                                            CIVIL ACTION NO.
                                                      12-12233-LTS


POLYVORE, INC.,
        Defendant.


**REPORT AND RECOMMENDATION RE:
DEFENDANT POLYVORE INC.'S MOTION TO DISMISS
(DOCKET ENTRY # 56)**

**March 2, 2015**


**BOWLER, U.S.M.J.**

In this copyright infringement action, plaintiff Robert
Sarvis ("plaintiff") alleges that defendant Polyvore, Inc.
("Polyvore"), an internet service provider, copies, displays and
distributes certain copyrighted works of artist Sheila Wolk
("Wolk") assigned to plaintiff.  Pending before this court is a
motion to dismiss all five counts in a second amended complaint
filed by Polyvore under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)").
(Docket Entry # 56).  After conducting a hearing, this court took
the motion (Docket Entry # 56) under advisement.

PROCEDURAL BACKGROUND

In January 2013, plaintiff filed an amended complaint
against Polyvore setting out claims for direct copyright
infringement, contributory copyright infringement, vicarious

copyright infringement, a declaratory judgment and a permanent injunction. Shortly thereafter, Polyvore filed a motion to dismiss under Rule 12(b)(6). In a Report and Recommendation, this court recommended dismissing the vicarious infringement claim with prejudice. Finding the presence of colorable claims of direct and contributory infringement, the opinion recommended dismissing these claims but allowing plaintiff an opportunity to file an amended complaint with more factual detail. Plaintiff complied by filing the second amended complaint that includes significantly greater factual detail.

In September 2013, the district judge accepted and adopted the Report and Recommendation. In October 2013, plaintiff filed a motion to reconsider the dismissal with prejudice of the vicarious infringement claim. In June 2014, the district judge denied the motion to reconsider the dismissal of the vicarious infringement claim. The district judge also allowed the motion to amend because it "included new facts concerning contest entries, winner lists and Polyvore's search functionality." (Docket Entry # 51). The district judge "decline[d] to address the highly technical [futility] arguments raised by Polyvore [in opposition] until they are squarely before the Court in a motion to dismiss or other dispositive motion." (Docket Entry # 51).

The second amended complaint raises the following claims: (1) direct copyright infringement (Count I); (2) inducement of

copyright infringement (Count II); (3) contributory copyright infringement (Count III); (4) vicarious copyright infringement (Count IV); and violation of 17 U.S.C. § 1201 ("section 1201") (Count V). Polyvore seeks to dismiss Count IV because this court dismissed the vicarious infringement claim with prejudice, the district judge accepted and adopted that dismissal and the district judge denied the motion for reconsideration challenging the dismissal. Plaintiff explains that he included the count because the motion for reconsideration remained pending at the time he filed the proposed second amended complaint. (Docket Entry # 67). Although the foregoing decisions are interlocutory, plaintiff fails to provide any adequate basis to revisit them. See generally Villanueva v. United States, 662 F.3d 124, 128 (1st Cir. 2011); Ellis v. United States, 313 F.3d 636, 646-648 (1st Cir. 2002).

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must include factual allegations that when taken as true demonstrate a plausible claim to relief even if actual proof of the facts is improbable. Bell Atlantic v. Twombly, 550 U.S. 544, 555-558 (2007). While "not equivalent to a probability requirement, the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully." Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (internal quotation

marks omitted).  "[W]here the well-pleaded facts do not permit
the court to infer more than the mere possibility of misconduct,
the complaint . . . has not shown that the pleader is entitled to
relief."  Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527,
533 (1st Cir. 2011) (internal quotation marks and citations
omitted).  Discarding legal conclusions and taking the facts in
the governing complaint as "true and read in a plaintiff's favor
even if seemingly incredible," the complaint "must state a
plausible, but not a merely conceivable, case for relief."
Sepúlveda-Villarini v. Dept. of Educ., 628 F.3d 25, 29 (1st Cir.
2010).

The court may consider a limited category of documents
outside the complaint without converting the motion into one for
summary judgment.  Such documents include public records,
documents central to the plaintiff's claims and documents
sufficiently referred to in the complaint.  See Butler v.
Balolia, 736 F.3d 609, 611 (1st Cir. 2013) (supplementing facts
in complaint "by examining 'documents incorporated by reference
into the complaint, matters of public record, and facts
susceptible to judicial notice'"); Freeman v. Town of Hudson, 714
F.3d 29, 36 (1st Cir. 2013) (court may consider "'official public
records; documents central to plaintiffs' claim; and documents
sufficiently referred to in the complaint'") (ellipses and
internal brackets omitted); Giragosian v. Ryan, 547 F.3d 59, 65-

4

66 (1ˢᵗ Cir. 2008) (can consider documents relied on in complaint, public records and other documents subject to judicial notice). Polyvore's reliance on articles available on the internet is therefore misguided. The articles cited in various footnotes in the supporting memorandum (Docket Entry # 57) are not part of the Rule 12(b)(6) record. Likewise, any statement plaintiff made in the first amended complaint, including statements regarding transformed art, that were not incorporated into the second amended complaint lie outside the Rule 12(b)(6) record. See Evergreen Partnering Group, Inc. v. Pactiv Corp., 720 F.3d 33, 40 n.2 (1ˢᵗ Cir. 2013) ("since '[a]n amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint *no longer bind the pleader*,' we limit our analysis to the allegations made in Evergreen's Second Amended Complaint") (emphasis added and citation omitted). Adhering to this standard, the facts are as follows.

## FACTUAL BACKGROUND[1]

Plaintiff is the assignee of 22 works of art created by Wolk, an internationally known artist recognized for her fantasy artwork. The assignment is dated September 10, 2012. All of the 22 assigned pieces of art are registered with the United States

---

[1] Citations to the record are provided only for direct quotations.

Copyright Office ("the registered works").  It took Wolk "many months" to create each piece.  (Docket Entry # 52, ¶ 15).  Wolk has been a professional artist for at least 40 years.  She has worked in the realm of fantasy art for 25 years and "[h]er art is in high demand and highly sought by individuals seeking fantasy and fairy art."  (Docket Entry # 52, ¶ 13).

By letter dated October 12, 2012, plaintiff notified Polyvore's registered agent that both Polyvore and its users were copying and displaying copyrighted works of Wolk assigned to plaintiff ("the October notice" or "the notice").  The notice identified 20 pieces of art that Polyvore and its users purportedly infringed by copying and displaying images of the art on Polyvore's website ("the copyrighted works").  The notice identified the exact location of each infringing document by providing one or more uniform resource locators ("URL") designating the location on Polyvore's website.  The notice describes the URL addresses as "a representative list of" the URLs associated with the infringed art pieces that are copied and displayed on the Polyvore website.  (Docket Entry # 52-4).  Plaintiff signed the notice, provided his address and included a statement that he had a "good faith belief that" the use infringed the copyrighted works.  (Docket Entry # 52-4).

At some point after receiving the notice, Polyvore "removed some copyrighted images from its website, but maintained" links

to other internet service providers.  The links allowed internet
users to access the copyrighted works on Polyvore's website by
performing an internet search, albeit not necessarily at the URLs
designated in the notice.  "[A]s of January 29, 2013," Polyvore
continued to have at least one of the copyrighted works on its
website at the URL address designated in the notice.  (Docket
Entry # 52, ¶ 21) (Docket Entry ## 52-4, 52-8).  Further, as
stated in the second amended complaint filed in July 2014, images
of three of the copyrighted works at the URL addresses in the
October 2012 notice are "located at the Polyvore site."  (Docket
Entry # 52, ¶ 82(c), (d), (e)) (Docket Entry # 52-4) (Docket
Entry # 52-7, Ex. E(c), E(d), E(e)).

Polyvore is a peer-to-peer website and an internet service
provider.  It is connected "through web-links with other"
websites such as Google and Facebook.  (Docket Entry # 52, ¶ 42).
Polyvore advertises itself as a "'fashion community'" or
"'fashion site'" but also provides a large database of searchable
images of art works in high resolution.  (Docket Entry # 52, ¶¶
44, 46).  Polyvore provides users with a free tool that allows
them to clip and copy images, including but not limited to
copyrighted images, from other websites and import the images to
the user's account on the Polyvore website.  In addition to
storing one or more single images in an account, a user can

create a "set" consisting of a group of independent images.[2] Polyvore does not charge users a fee to use its editing system. In fact, it pays users of its website to clip or copy "large amounts of art" from other websites and to bring a large number of visitors to Polyvore's website. (Docket Entry # 52, ¶¶ 46, 77).

Polyvore compiles a central database that includes all of the "stored art and 'sets'" of its users in high resolution. (Docket Entry # 52, ¶¶ 46, 50, 51, 60). Polyvore users as well as visitors to the website can access the searchable database of art at no charge by using a search function on the website. A search performed by a user or visitor typically yields a group of small, high resolution images on one side of a computer screen. The user or visitor can then enlarge the image using one of Polyvore's editing tools. To provide an example, a search for "fairies" or "fantasy" yields various images, including small, high resolution images of one or more of the copyrighted works or portions of the copyrighted works. A search for "fairy" produces a number of small, high resolution images, one of them being one of the copyrighted works, albeit not at the URL designated in the October notice. (Docket Entry # 52, ¶ 87) (Docket Entry # 52-10) (Docket Entry # 52-3, No. 15).

---

[2] The website contains an estimated "44 million sets" as of August 2012. (Docket Entry # 52, ¶ 41).

8

When a user or viewer performs a search, the search results also produce small, high resolution images under categories of "'[y]ou might also like'" and "'more items & looks'" and, with respect to copyrighted images, with the copyright watermarks already removed. (Docket Entry # 52, ¶¶ 72, 89) (Docket Entry # 52-11). A Google search performed in August 2013 using the name of a copyrighted work and "Polyvore" or using the search terms "Polyvore Sheila Wolk" yielded eight URL addresses on the Polyvore website with images of a number of the copyrighted works or portions of the copyrighted works. None of the URL addresses were included in the October notice. "Plaintiff's statistical sample searches" of the Polyvore website for one of the copyrighted works resulted in 39 URL addresses on the website with the copyrighted image. (Docket Entry # 52, ¶¶ 55, 82). Again, none of the 39 URL addresses were included in the October notice.

Polyvore advertises and promotes itself as having the ability to store images in high resolution. The central database includes images, including but not limited to copyrighted art, stored "in high resolution." (Docket Entry # 52, ¶¶ 46, 50, 60). A user can access the high resolution image stored in his or her account or set. A user or visitor can also enlarge the image using an editing tool that Polyvore provides. Drawing reasonable inferences from the second amended complaint, the enlarged image

produces a usable high resolution image without a loss of
clarity.

Polyvore's editing system allows users or visitors to cut
and paste, crop, enlarge and edit the high resolution images
stored in the central database and accessed on Polyvore's
website.  Polyvore has an "automatic feature" that can remove the
background or foreground of an image.  (Docket Entry # 52, ¶ 65).
Users and visitors can therefore separate the central image from
the copyrighted notice, which is oftentimes located in the
foreground or background of a copyrighted image.  The editing
system gives the user or visitor the ability to remove copyright
notices placed on images and to eliminate an artist's "copyright
watermarks."  (Docket Entry # 52, ¶¶ 52, 64, 70, 81).  "Polyvore
and/or its Users removed the copyright watermarks on the
[registered works]."  (Docket Entry # 52, ¶ 88).

Polyvore's Chief Executive Officer, Jess Lee ("Lee"),
belongs to a number of "on-line art sites and art groups."
(Docket Entry # 52, ¶ 32).  After the date of the October notice,
one such group copied and added images to one of the copyrighted
works on the Polyvore website.[3]  As a user of Polyvore's website,
Lee creates sets using one or more copyrighted images on the

---

[3]  This court has considered but not summarized the facts
regarding Lee's history with computers and art as well as her
knowledge, use and expertise regarding Polyvore's website and
editing tools.  (Docket Entry # 52, ¶¶ 31-39, 65).

Polyvore website.

Polyvore generates revenue by receiving commissions from retail merchants when a Polyvore user or visitor purchases a merchant's product as a result of using the Polyvore site. It also receives revenue from advertisers and from fees it receives from sponsors of contests run on Polyvore's website.

Polyvore runs contests on its website more than once a week for Polyvore users. The "contests offer prizes provided by advertising sponsors." (Docket Entry # 52, ¶ 67). Initially, the user creates a set using Polyvore's editing tools and database of images and thereafter enters the set into the contest. Polyvore then copies the set, adds it to the central database and includes the set in an entry list. The sponsor selects the winning entries. Polyvore then copies the winning sets and publishes the list on its website. Users often employ copyrighted images to create the sets entered into the contests. In fact, users have created sets using the copyrighted works with the copyright watermarks removed which Polyvore then copies and enters into the entry lists. Sponsors have chosen entries as winners for images of at least one of the copyrighted works.[4] Polyvore then copied and published the list of these winners on

_____

[4] Having considered the Christopher Muller affidavit in light of the references to the URLs in the second amended complaint, this court construes the facts in plaintiff's favor in making the above finding.

its website.[5]

<u>DISCUSSION</u>

Polyvore moves to dismiss the second amended complaint based on "three independent doctrines" or arguments and an additional argument relative to section 1201(2) (Count V). (Docket Entry # 57). First, Polyvore submits that the doctrine of fair use bars the claim for direct infringement. According to Polyvore, the website's display of thumbnail or reduced size images for purposes of reporting, commentary or facilitating access falls squarely within the fair use doctrine. Further, the doctrine protects the highly transformative use of the thumbnail images and/or the creative collaging and collage related uses that the website provides.

Second, Polyvore maintains that <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.</u>, 545 U.S. 913, 932–33 (2005) ("<u>Grokster</u>"), and <u>Sony Corp. v. Universal City Studios, Inc.</u>, 464 U.S. 417, 442 (1984) ("<u>Sony</u>"), absolve the equivocal conduct of selling items with unlawful and lawful uses as a means of imposing liability for contributory infringement. Polyvore argues that counts II and III respectively fail because Polyvore did not intentionally induce or encourage any direct infringement and it did not knowingly and materially contribute to any direct infringement. Finally, Polyvore contends that direct infringement is absent

---

[5] See the previous footnote.

based on the fair use doctrine given the transformative uses the
website provides and, accordingly, there is no liability for
contributory infringement.

Third, Polyvore's conduct falls within the statutory safe
harbor provided by the Digital Millennium Copyright Act ("the
DMCA"), 17 U.S.C. § 512(c) ("section 512(c)").  This statute
shields from liability a service provider's liability for
copyright infringement "by reason of the storage at the direction
of the user of material" that resides on its system.  17 U.S.C. §
512(c).

## I.  Direct Infringement (Count I)

In order to prevail on a copyright infringement claim, the
"plaintiff must prove (1) ownership of a valid copyright, and (2)
copying of constituent elements of the work that are original."
Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340,
361 (1991); Society of the Holy Transfiguration Monastery, Inc.
v. Gregory, 689 F.3d 29, 39 (1st Cir. 2012).  At present,
Polyvore does not maintain that Count I fails because plaintiff
does not own the copyrighted works.  With respect to the second
element, however, Polyvore submits, albeit in the context of its
transformative fair use argument, that substantial similarity is
lacking.[6]  (Docket Entry # 57, § II(C)).  Accordingly, this court

---

[6] Although not free from doubt that Polyvore even raises a
substantial similarity argument, this court addresses it out of
an abundance of caution.  This court also considers the argument

turns to the second element.

The second element of copying is twofold. It requires a showing of actual or factual copying as well as a showing of substantial similarity. Society of the Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 48-49. Substantial similarity occurs when "the copying was so flagrantly extreme that the allegedly infringing and copyrighted works were, for all intents and purposes, '"substantially similar."'" Id. at 48 (quoting Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001)). The standard is gauged by an "'ordinary observer' test." Id. at 50. "Under this rubric, two works will be deemed substantially similar if a reasonable ordinary observer, on examining both, 'would be disposed to overlook' the disparities between the works, 'and regard their aesthetic appeal as the same.'" Id. (quoting Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 607 (1st Cir. 1988)).

In arguing that substantial similarity is lacking, Polyvore relies on statements plaintiff made in the first amended complaint. As previously explained, such reliance is misplaced because the second amended complaint supersedes the first amended complaint. Factual statements made in the first amended complaint that plaintiff did not incorporate into the second

as it applies to the fair use doctrine.

amended complaint "'no longer bind the pleader.'"  Evergreen
Partnering Group, Inc. v. Pactiv Corp., 720 F.3d at 40 n.2.

Overall, a reasonable ordinary observer could readily
overlook the disparity, if any, between Wolk's *Chameleon* (Docket
Entry # 52-3) and the high resolution image of the work as it
appeared on Polyvore's website between October 12, 2012, and at
least January 29, 2013 (Docket Entry # 52, ¶ 21) (Docket Entry #
52-8).  The similarities between the original expressive elements
of Wolk's *Chameleon* and the image on the website are striking and
dominate the website image as a whole.  To a lesser extent, a
reasonable ordinary observer would reach the same conclusion with
respect to Wolk's *Earth* and *Hearts Content* pieces (Docket Entry #
52-3) and their respective images on Polyvore's website (Docket
Entry # 52-7, Ex. E(c), E(d)).  Indeed, it is more than plausible
that substantial similarities exist between the original elements
of these copyrighted works and the foregoing, corresponding
images on the Polyvore website.  Given the nature of the
argument, which does not point to the absence of substantial
similarity as to any particular copyrighted work, dismissal due
to the lack of substantial similarity is not warranted.

The primary argument Polyvore makes with respect to direct
infringement is based on fair use.  Fair use is a defense and, as
such, Polyvore bears the underlying burden of proof at trial.
See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994).

The defense, codified in 17 U.S.C. § 107, balances and weighs four factors "together in light of the purposes of copyright," id. at 578, to decide "whether a use is fair or infringing." Society of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 59. The four, non-exclusive factors are "the purpose and character of a work's use, the nature of the copied work, the extent of the copying, and its effect on a work's market value." Id.; 17 U.S.C. § 107.

With respect to the first factor, Polyvore insists that reduced size or thumbnail images on its website are different than the copyrighted works because they serve a different purpose than the copyrighted works. Whereas the latter serve an entertainment or artistic purpose, the former serve "'to inform,' to 'improve access to information,' and even" to provide commentary, according to Polyvore. (Docket Entry # 57).

The focus of the first factor, 17 U.S.C. § 107(1), is "'whether the new work merely "supersedes the objects" of the original creation or instead adds something new.'" Nunez v. Caribbean Intern. News Corp., 235 F.3d 18, 21-22 (1st Cir. 2000) (quoting Campbell, 510 U.S. at 579). Specifically, the inquiry examines "'whether the new work merely supersedes the objects of the original creation' or whether it 'adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" Society of Holy

Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 60

(quoting Campbell, 510 U.S. at 579) (internal citations and

quotation marks omitted).  Although the existence of

"'transformative use is not absolutely necessary for a finding of

fair use,'" the copyright law's "goal of 'promoting science and

the arts, is generally furthered by the creation of

transformative works.'"  Id. (quoting Campbell, 510 U.S. at 579)

(internal brackets omitted).  The statutory language setting out

the first factor "makes clear that the commercial or nonprofit

educational purpose of a work is only one element of the first

factor enquiry into its purpose and character."  Campbell, 510

U.S. at 584.

Polyvore cites to the informative character of Polyvore's

display of thumbnail images in response to search requests and

the alternative suggestions provided in response to a search as

"non-actionable" fair use.  (Docket Entry # 57).  The informative

nature or the commentary feature of the images is instructive and

relevant, particularly in light of the examples of fair use in

section 107's preamble, but it is the transformation from the

originally intended purpose of the copyrighted work into a

different or further purpose that constitutes the focal point of

the inquiry.  See Nunez v. Caribbean Intern. News Corp., 235 F.3d

at 22-23.  Thus, when Google's search engine in response to a

user's search produces lower resolution thumbnail images of

17

copyrighted images,[7] the search engine provides a social benefit and value to the public and serves a different function than the original copyrighted photographs.  See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165-1167 (9th Cir. 2007).

Polyvore relies on the Ninth Circuit's interpretation of fair use in Perfect 10, 508 F.3d at 1165-1166.  (Docket Entry # 57).  From one vantage point, however, Polyvore's website and search functionalities serve to facilitate access to copyrighted artwork and serve an aesthetic purpose.  This purpose is more closely aligned with the originally intended purpose of Wolk's copyrighted works as aesthetic art and artistic expression than the purpose of Google's search functionalities in Perfect 10, which served the public in general in seeking access to all forms of information and served as an electronic reference tool.  See id. at 1164-1167.  In addition, although Polyvore's editing tools allow a user to alter a copyrighted work stored in the central database or imported from a third party website and add something new to the expression, they also allow a user to create a set by simply extracting the essential parts of a copyrighted art's image and then add little, if any, new expression.  See Society of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 60 (quoting Folsom v. Marsh, 9 F.Cas. 342, 345 (No. 4,901)

_____

    [7]  It is worth noting that Google's search results direct the user to a third party's website when the user clicks the thumbnail image.  Id. at 1155.

(C.C.D.Mass. 1841)).  Whereas promoting the arts is undeniably one of the goals of copyright, see id., the first factor does not weigh as heavily in Polyvore's favor as Polyvore contends.

The second factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), recognizes "that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. at 586; see Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 563 (1985) ("law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy").  As explained by the First Circuit in Gregory, the second factor entails considering "two elements:  (1) whether the [copyrighted works] are factual or creative, and (2) whether the [copyrighted works] have previously been published."  Society of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 61 (citation to Harper Row, 471 U.S. at 563, omitted).  The fanciful and highly creative nature of the copyrighted works weighs firmly in plaintiff's favor.  The scope of fair use is nevertheless "narrower with respect to unpublished works."  Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. at 564; Society of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 61; see also Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d at 1167. Overall, considering each of these elements and viewing the

record in plaintiff's favor, this factor militates against a finding of fair use.

The third factor considers the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Wholesale copying generally militates against a finding of fair use. See Society of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 62. The factor may remain "of little consequence" even when an infringer copies the entire work if "copy[ing] any less than that would have made the [copyrighted picture] useless to the story" featuring the photograph. Nunez v. Caribbean Intern. News Corp., 235 F.3d at 24. Construing the record in plaintiff's favor, the factor remains netural.

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "[T]his factor is 'concerned with secondary uses that, by offering a substitute for the original, usurp a market that properly belongs to the copyright holder.'" Nunez v. Caribbean Intern. News Corp., 235 F.3d at 24 (quoting Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 110 (2nd Cir. 1998)). It entails considering "(1) the degree of market harm caused by the alleged infringer's actions, and (2) 'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market

for the original.'" Society of Holy Transfiguration Monastery,
Inc. v. Gregory, 689 F.3d at 64 (quoting Campbell, 510 U.S. at
590) (internal ellipses omitted). Here, Polyvore's editing tools
allow enlargement of high resolution thumbnails into full size
"useable images" of portions or, in some instances, all of the
copyrighted works. (Docket Entry # 52). Conversely, as Polyvore
points out, thumbnail images are not as harmful to the potential
market for the copyrighted works as full size, high resolution
images. See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d at
1168.

Weighing all of the factors in light of the purposes of the
copyright law does not result in a finding of fair use on a
motion to dismiss. The Rule 12(b)(6) record plausibly allows a
finding of an infringment as opposed to a fair use.

Polyvore's additional argument that the second amended
complaint includes only two contest winner lists compiled by
"bebed" and "temitopeze" (Docket Entry # 57) is not convincing.
It is not apparent that the exhibits' reference to "created by"
refers to the adjacent images or to the contest winners' list.
The record allows a reasonable inference that it refers to the
former and that "bebed" and "temitopeze" did not run the
contests. Rather, Polyvore ran the contests, copied the sets
entered into the contest, copied the winning sets and published
the list on its website. (Docket Entry # 52).

II. <u>Inducement of Copyright Infringement (Count II)</u>

Polyvore seeks to dismiss Count II because plaintiff fails to plausibly allege that it intentionally induced or otherwise encouraged direct infringement. (Docket Entry # 57). In presenting the argument, Polyvore relies primarily on <u>Grokster</u> and, to a lesser extent, the <u>Sony</u> decisions.

The Supreme Court in <u>Grokster</u> "held that copyright liability could be premised on a theory of active inducement of infringement, so that 'one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.'" <u>Universal Communication Systems, Inc. v. Lycos, Inc.</u>, 478 F.3d 413, 420-421 (1st Cir. 2007) (quoting <u>Grokster</u>, 545 U.S. at 936-937). <u>Sony</u>, in turn, bars "secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." <u>Grokster</u>, 545 U.S. at 933-934; <u>see</u> <u>Sony</u>, 464 U.S. at 441-442. Copyright law "absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused." <u>Grokster</u>, 545 U.S. at 932-933. Accordingly,

the fact that Polyvore knows that its website and editing tools allow users to clip and copy copyrighted art as well as art or other items in the public domain does not, without more, provide a basis to find Polyvore liable for inducing or encouraging direct infringement.

The decision in <u>Grokster</u> overturned a summary judgment ruling in favor of Groskter, a distributer of free software that allowed peer-to-peer file sharing between users' computers.  <u>See</u> <u>id.</u> at 919, 941.  Evidence that supported Grokster's and another distributer's liability for inducing infringement included:  (1) "internal communications and advertising efforts" targeting "users of Napster, a population well-known for committing copyright infringement through file-sharing programs;" (2) a failure to develop or implement "filtering tools or other means of limiting infringement;" and (3) advertising revenue that depended upon "a high volume of users which in turn depended overwhelmingly on users' ability to engage in infringing activities through the [software] program."  <u>Arista Records LLC</u> <u>v. Lime Group LLC</u>, 784 F.Supp.2d 398, 425 (S.D.N.Y. 2011) (summarizing <u>Groskter</u>, 545 U.S. at 938-939); <u>see</u> <u>Grokster</u>, 545 U.S. at 939-940.

Here, Polyvore does not directly advertise or solicit users to engage in infringement and copying of copyrighted articles and products.  It nevertheless offers and promotes "a large,

searchable database of art, particularly copyrightable art in high resolution" and largely free of copyright watermarks. (Docket Entry # 52, ¶¶ 43-46, 49-54, 60, 61). It promotes contests, including a contest in which one of the copyrighted works was a winner, and receives revenues from sponsor fees for such contests. The facts support a finding that Lee is an agent of Polyvore, see generally Coach, Inc. v. Sapatis, 27 F.Supp.3d 239, 244 (D.N.H. 2014) (common law agency principles apply to copyright law), and a member of a group that has copied an image of a copyrighted work, albeit not the image located at the URL address in the October notice. These and other facts in the second amended complaint set out a plausible claim that Polyvore intentionally induced and encouraged infringement.

III.  Contributory Infringement (Count III)

Count III alleges that Polyvore, acting with actual and constructive knowledge, caused and materially contributed to the infringement of the copyrighted works. (Docket Entry # 52, ¶¶ 111-119). Polyvore maintains that the theory contravenes the Grokster and Sony decisions and that plaintiff implicitly concedes that Polyvore removed all of the allegedly infringing images identified in the October notice. Contrary to the latter assertion, at least one copyrighted work remained on Polyvore's website at the URL address in the October notice as of January 29, 2013.

As previously explained, knowledge that "some of one's products will be misused" does not create liability for contributory infringement. <u>Grokster</u>, 545 U.S. at 932-933. Courts limit contributory infringement "liability to instances of more acute fault than the mere understanding that some of one's products will be misused." <u>Id.</u>  Thus, "'[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another may be held liable as a "contributory" infringer.'"  <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 117-118 (2nd Cir. 2010) (quoting <u>Gershwin Publishing Corp. v. Columbia Artists Management, Inc.</u>, 443 F.2d 1159, 1162 (2nd Cir. 1971)); <u>see Star Pacific Corp. v. Star Atlantic Corp.</u>, 574 Fed.Appx. 225, 230 (3rd Cir. Aug. 6, 2014); <u>Jaso v. The Coca Cola Co.</u>, 2011 WL 3279202, at *5 (5th Cir. Aug. 1, 2011); <u>Dream Games of Arizona, Inc. v. PC Onsite</u>, 561 F.3d 983, 995 (9th Cir. 2009) ("contributory infringement requires proof that a defendant '(1) has knowledge of a third party's infringing activity, and (2) induces, causes, or materially contributes to the infringing conduct'"); <u>NCR Corp. v. Korala Associates, Ltd.</u>, 512 F.3d 807, 816 (6th Cir. 2008). Count III differs from Count II in the sense that it focuses upon Polyvore's knowledge coupled with its conduct that caused or materially contributed to the infringement.

Polyvore's actual knowledge of the infringement of one of

the copyrighted works and its failure to take action in response together with Lee's conduct, to the extent she acted as an agent of Polyvore, provides a basis to impose contributory infringement liability. Moreover, Polyvore actively distributed its editing tools, which allow users to clip and copy copyrighted images which, in turn, reside in Polyvore's central database searchable to users and visitors. Using its editing tools, "Polyvore and/or its users removed the copyright watermarks on the [copyrighted works]." (Docket Entry # 52, ¶ 88). The facts are therefore sufficient to state a plausible contributory infringement claim.

Polyvore's argument that this court implicitly rejected a theory that Polyvore knowingly and materially contributed to infringement is inaccurate. See generally Iacobucci v. Boulter, 193 F.3d 14, 19 (1st Cir. 1999) (deferring to district judge's interpretation of her own order). The prior recommendation was also based on a different factual record which the second amended complaint greatly expands with new and additional facts.

Polyvore further argues that because direct infringement is lacking based on the fair and transformative use, the contributory infringement claim is subject to dismissal. Inasmuch as the fair use doctrine did not lead to a dismissal of the direct infringement claim, Polyvore's reasoning does not lead to a dismissal of Count III.

IV. DMCA's Safe Harbor

Polyvore contends that the DMCA shields it from liability for any infringement. It raises two arguments. First, Polyvore submits that the facts do not fall within the exception to the safe harbor that applies when a service provider receives a financial benefit "directly attributable to the infringing activity" and "has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Second, Polyvore argues that plaintiff's DMCA notice did not comply with the statute, 17 U.S.C. § 512(c)(3)(A), a service provider has no affirmative duty to monitor its website and the exception for a service provider's failure to expeditiously remove infringing material does not apply. Plaintiff disagrees.

Addressing the second argument, the October notice complied with the statutory requirements in section 512(c)(3)(1) at least as to the copyrighted works identified by the URL addresses in the notice. The notice adequately identified the copyrighted works. <u>See</u> U.S.C. § 512(c)(3)(A)(ii). It also sufficiently identified the infringing material on the website by providing the URL addresses. <u>See</u> 17 U.S.C. § 512(c)(3)(A)(iii).

The safe harbor applies when, "upon notification of claimed infringement as described in paragraph (3)," the service provider "responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity." 17 U.S.C. § 512(c)(1)(C). Conversely, as

pointed out by Polyvore, it does not apply when there is a "failure to 'expeditiously . . . remove' infringing material of which the service provider has sufficient knowledge." (Docket Entry # 57). Because the facts support a finding that Polyvore had actual knowledge of infringing material on its website and failed expeditiously to remove it, the DMCA's safe harbor does not provide a basis for a Rule 12(b)(6) dismissal of the infringement counts.[8]

## V.   Section 1201

Count V alleges that Polyvore provides an editing and, more specifically, a formatting system that automatically removes the foreground and background of an image. The formatting system thereby allows a user or visitor to remove an artist's copyrights and/or copyright watermarks and claim the image as his own. (Docket Entry # 52, ¶ 52, 64, 65, 70, 81, 130-134). The count cites section "1201(2)(a-c)," a non-existent subsection of section 1201. As elucidated in the brief, plaintiff repeatedly cites section 1201(a)(2) and discusses the meaning of the language "'effectively controls access to a work.'" (Docket Entry # 62). Accordingly, this court construes the count as

---

[8]   It is therefore not necessary to address the argument that the financial benefit exception in section 512(c)(1)(B) does not apply.

alleging a violation of section 1201(a)(2).[9]  Section 1201(a)(2)

proscribes any person from offering the public a product or

service that "is primarily designed or produced for the purpose

of circumventing a technological measure that effectively

controls access to" a copyrighted work.  17 U.S.C. § 1201(a)(2).

Polyvore moves to dismiss Count V because section 1202(a)(2)

bars "only 'technological measures that effectively control[]

access to a work protected under [the Copyright act].'"  (Docket

Entry # 57) (quoting section 1201(a)(2)(A)).  "'[A] technological

measure "effectively controls access to a work"' only 'if the

measure, in the ordinary course of its operation, requires the

application of information, or a process or a treatment, with the

authority of the copyright owner, to gain access to the work,'"

according to Polyvore.  (Docket Entry # 57) (quoting section

1201(a)(3)(B)).  Consequently, Polyvore maintains that section

1201(a)(2) does not encompass copyright symbols and/or watermarks

because they "do not 'require the application of information, or

a process or a treatment to gain access to the work.'"  (Docket

Entry # 57) (quoting section 1201(a)(3)(B) with internal

bracketing omitted).

_____

[9]  Section 1201 contains a number of causes of action.  If
plaintiff wishes to bring a different cause of action under
section 1201 or the DMCA, he must seek leave to amend the
complaint within the time frame of any scheduling order.  In the
event he does not seek leave, he has waived any argument that
Count V encompasses a cause of action other than section
1201(a)(2).

Quoting section 512(i)(2), plaintiff submits that a digital

watermark, such as "Sheila Wolk" with the copyright mark ©, is a

digital technological measure because it is "'used by copyright

owners to identify of protect copyrighted works.'" (Docket Entry

# 62). The forgoing definition of "the term 'standard

technological measures'" quoted by plaintiff, however, only

applies to "this subsection," namely, subsection 512(i). The

determinative inquiry is the language used in section 1201(a).

Section 1201(a)(2) reads as follows:

> No person shall manufacture, import, offer to the public,
> provide, or otherwise traffic in any technology, product,
> service, device, component, or part thereof, that—
>
> (A) is primarily designed or produced for the purpose of
> circumventing a *technological measure that effectively
> controls access* to a work protected under this title;
>
> (B) has only limited commercially significant purpose or use
> other than to circumvent a *technological measure that
> effectively controls access* to a work protected under this
> title; or
>
> (C) is marketed by that person or another acting in concert
> with that person with that person's knowledge for use in
> circumventing a *technological measure that effectively
> controls access* to a work protected under this title.

17 U.S.C. § 1201(a)(2) (emphasis added). Simply stated,

"subsection 1201(a)(2) covers those who traffic in technology

that can circumvent 'a technological measure that effectively

controls access to'" a copyrighted work. <u>Universal City Studios,

Inc. v. Corley</u>, 273 F.3d 429, 441 (2nd Cir. 2001). The First

Circuit explains that liability under section 1201(a)(2) requires

a plaintiff to "establish two elements: '(1) defendant trafficked in a technology; and (2) the technology was primarily designed or produced to circumvent conditional access controls to protected works, or has limited commercially significant use other than such circumvention.'" CoxCom, Inc. v. Chaffee, 536 F.3d 101, 110 (1st Cir. 2008) (quoting Directv Inc. v. Little, 2004 WL 1811153, *6 (N.D.Cal. Aug.12, 2004)).

The second element and the plain language of the statute require that Polyvore provide a service that is primarily designed for circumventing a technological measure. Subsection 1201(a)(3) defines to "circumvent a technological measure" as including the removal of "a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(2). Plaintiff therefore reasonably argues that Polyvore's editing and formatting tools are designed to remove the copyright watermarks on the copyrighted works.

By its terms, however, subsection 2012(a)(2) additionally requires "a technological measure that effectively controls access to" a copyrighted work. 17 U.S.C. § 1201(a)(2). Subsection 1201(a) includes a definition of a technological measure that effectively controls access. It states that, "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with

the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3).  The technological measure that controlled access in Coxcom was "CoxCom's pay-per-view delivery and billing system that scrambles pay-per-view programming unless subscribers choose to purchase and view it."  CoxCom, Inc. v. Chaffee, 536 F.3d at 110.

Plaintiff asserts that Microsoft Picture It or Paint Shop Pro was used to place the watermark of Sheila Wolk and the copyright mark © on the copyrighted images.  (Docket Entry # 62). He then argues that "access" is synonymous with "use" and that "placing the name of the artist and the copyright symbol across the face of the original" using the digital processes "prevents access to or use of original Image."  (Docket Entry # 62).

The plain language of subsection 1201(a)(3)(B), however, dictates that a technological measure controls access only if it "requires the application of information or a process or a treatment . . . to gain access to a work."  17 U.S.C. § 1201(a)(3).  A watermark does not require information or a process or a treatment to gain access to the copyrighted work. Access or lack of access exists to a copyrighted work whether or not it contains a watermark or a copyright © symbol.  To the extent there is any ambiguity in the language, the legislative history clarifies "that a technological measure 'effectively controls access' to a copyrighted work if its *function* is to

control access." <u>Universal City Studios, Inc. v. Reimerdes</u>, 111 F.Supp.2d 294, 318 (S.D.N.Y. 2000) (emphasis in original). Neither the watermark nor the copyright © symbol function to control access to the copyrighted work. Polyvore is therefore correct that section 1201(a)(3)(B) does not encompass the watermark and/or the copyright © symbol thus warranting dismissal of Count V.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, it is **RECOMMENDED**[10] that Polyvore's motion to dismiss be **ALLOWED** as to counts IV and V and otherwise **DENIED** as to the remaining counts.

        /s/ Marianne B. Bowler        
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[10] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. <u>See</u> Fed.R.Civ.P. 72(b). Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.