UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT SARVIS,
     Plaintiff,


     v.                                    CIVIL ACTION NO.
                                           12-12233-LTS


POLYVORE, INC.,
     Defendant.


**REPORT AND RECOMMENDATION RE:**
**DEFENDANT POLYVORE'S CROSS-MOTION FOR JUDGMENT ON**
**THE PLEADINGS (DOCKET ENTRY # 89); PLAINTIFF'S MOTION**
**FOR PARTIAL JUDGMENT ON THE PLEADINGS**
**(DOCKET ENTRY # 84)**

**August 24, 2015**


**BOWLER, U.S.M.J.**

In this copyright infringement action, plaintiff Robert
Sarvis ("plaintiff") alleges that defendant Polyvore, Inc.
("Polyvore"), an internet service provider, copies, displays and
distributes certain copyrighted works of artist Sheila Wolk
("Wolk").  Wolk purportedly assigned the copyrights to plaintiff
under a written "Copyright Assignment" dated September 10, 2012.
(Docket Entry # 52-2).

Pending before this court is a motion for judgment on the
pleadings on Count I filed by plaintiff under Fed.R.Civ.P. 12(c)
("Rule 12(c)").  (Docket Entry # 84).  Polyvore opposes the
motion and separately moves for judgment on the pleadings under
Rule 12(c) to dismiss the second amended complaint ("SAC") in its

entirety.[1]  (Docket Entry # 89).

Plaintiff's motion addresses the merits of the direct infringement claim in Count I whereas Polyvore's motion challenges plaintiff's standing to bring an action under the Copyright Act of 1976, 17 U.S.C. §§ 101-1332.  In particular, Polyvore maintains that plaintiff is not the "legal or beneficial owner" of the copyrights at issue within the meaning of 17 U.S.C. § 501(b) ("section 501(b)").  After conducting a hearing, this court took the motions (Docket Entry ## 84, 89) under advisement.

PROCEDURAL BACKGROUND

Plaintiff, who is proceeding pro se, initiated this action on November 30, 2012.  On September 4, 2013, plaintiff filed a motion to amend a first amended complaint and on June 30, 2014, the court allowed the motion.  Plaintiff filed the SAC on July 8, 2014.[2]  The SAC (Docket Entry # 52), as modified by this court's second Report and Recommendation (Docket Entry # 75) adopted by the district judge (Docket Entry # 80), sets out the following

---

[1]  The last page of the memorandum includes a citation to Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)").

[2]  Because plaintiff's standing, if any, arises by virtue of the September 10, 2012 assignment, it is not necessary to address whether plaintiff was the "legal or beneficial owner," 17 U.S.C. 501(b), on the date he filed the original complaint or on the date he filed the SAC.  See generally Connectu LLC v. Zuckerberg, 522 F.3d 82, 91-92 (1st Cir. 2008) (discussing time of filing rule when the plaintiff invokes federal question jurisdiction in copyright action for first time in amended complaint filed as of right).

claims:  (1) direct copyright infringement (Count I); (2) inducement of copyright infringement (Count II); and (3) contributory copyright infringement (Count III).

I.  <u>Plaintiff's Rule 12(c) Motion</u>

Polyvore argues that the motion lacks merit because the answer denied all of the key allegations in the SAC.  Polyvore further submits that the eight exhibits plaintiff attached to the motion are extraneous to the Rule 12(c) record and it objects to their authenticity.  The SAC attaches five of the eight exhibits. (Docket Entry ## 52-7, 52-8, 52-11, 52-12, 52-13).  Polyvore alternatively maintains that plaintiff is not entitled to a judgment on the pleadings on the direct infringement claim even considering the exhibits.  Specifically, Polyvore argues that its conduct was not volitional; the Digital Millennium Copyright Act ("the DMCA"), 17 U.S.C. § 512(c) ("section 512(c)"), shields it from liability; and its fair use defense prevails as a matter of law.

Plaintiff contends this court can take judicial notice of the five exhibits attached to the SAC and the additional three exhibits attached to the motion.  According to plaintiff, the admissions made by Polyvore in various filings (Docket Entry ## 43, 57) and in these exhibits, including an "official blog of Polyvore" (Docket Entry # 84-3), Polyvore's contest rules (Docket Entry # 52-5) and website snapshots (Docket Entry ## 84-1, 84-2,

84-3, 84-6), combine to establish direct infringement, especially with respect to the Chameleon, Gatekeeper and Field of Dreams copyrighted works.[3]  Plaintiff further asserts that the fair use and DMCA defenses do not protect Polyvore from liability.

STANDARD OF REVIEW AND SCOPE OF THE RECORD

A Rule 12(c) motion for judgment on the pleadings "is treated much like a Rule 12(b)(6) motion to dismiss." Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008). Legal conclusions are ignored and, "under Rule 12(c), courts need not credit conclusory statements or merely subjective characterizations."  Class v. Commonwealth of Puerto Rico, 309 F.Supp.2d 235, 236 (D.P.R. 2004); see Soto-Torres v. Fraticelli, 654 F.3d 153, 158-159 (1st Cir. 2011).  Certain text in the cover pages of a number of exhibits attached to the SAC therefore lie outside the Rule 12(c) record because they constitute legal conclusions.  These include the text in the cover pages that reads, "Examples of Polyvore Users Copyright Infringement of the Images" (Docket Entry # 84-4), "Examples of Polyvore's Failure to Expeditiously Take Down or Disable Images after DMCA Notification" (Docket Entry # 84-5) and "Specific Examples of Direct Copyright Infringement by Polyvore as a Result of Its 'You Might Also Like' and 'More Items & Looks' Functions" (Docket

---

[3]  Although the supporting memorandum and reply brief focus on direct infringement of these works, plaintiff seeks a judgment on the pleadings as to Count I with respect to all 22 of the purportedly copyrighted works.

Entry # 84-6).

Because a Rule 12(c) "motion calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom" in the nonmovant's favor. R.G. Financial Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006). Accordingly, "There is no resolution of contested facts in connection with a Rule 12(c) motion: a court may enter judgment on the pleadings only if the properly considered facts conclusively establish the movant's point." Id.; accord 5C Charles Allan Wright et al., Federal Practice and Procedure § 1368 (3rd ed. 2004) ("motion for judgment on the pleadings under Rule 12(c) may be granted only if all material issues can be resolved on the pleadings by the district court").

A Rule 12(c) motion nonetheless differs from a Rule 12(b)(6) motion because it "implicates the pleadings as a whole." Aponte-Torres v. University of Puerto Rico, 445 F.3d 50, 55 (1st Cir. 2006). Filed after the close of the pleadings, a Rule 12(c) motion is "based solely on the factual allegations in the complaint and answer." NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 8 (1st Cir. 2002).

As a result of the obligation to view the facts and reasonable inferences in favor of the nonmovant, a court should

"treat[] any allegations in the answer that contradict the complaint as false" when the defendant is the moving party. Goodman v. Williams, 287 F.Supp.2d 160, 161 (D.N.H. 2003); accord Rimmer v. Colt Industries Operating Corp., 656 F.2d 323, 326 (8th Cir. 1981) (noting, with respect to defendant's Rule 12(c) motion, that review assumes all "well pleaded factual allegations in Rimmer's amended complaint are true, and all contravening assertions in Colt's answer are assumed to be false"); see Stanton v. Larsh, 239 F.2d 104, 106 (5th Cir. 1957). Conversely, where, as here, plaintiff is the moving party, this court is obligated to view the facts in favor of Polyvore as the non-moving party. See generally R.G. Financial Corp. v. Vergara-Nunez, 446 F.3d at 182.

In deciding a motion for judgment on the pleadings filed by a plaintiff, the court therefore "consider[s] only '"allegations of fact [that] are admitted or not controverted in the pleadings."'" Swepi, LP v. Mora County, N.M., 2015 WL 365923, at *2 (D.N.M. Jan. 19, 2015); see also 5C Charles Allan Wright et al., Federal Practice and Procedure § 1367 (3rd ed. 2004) ("motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings"). Thus, when a defendant denies all of the allegations in an amended complaint, "the pleadings present genuine issues of material facts" and a plaintiff is "not

6

entitled to judgment as a matter of law."[4] <u>Shipman v. Rochelle</u>,
2013 WL 458267, at *2 (M.D.Pa. Feb. 6, 2013).

Subject to certain narrow exceptions and absent a conversion
of the Rule 12(c) motion to a summary judgment motion under the
procedure set forth in Rule 12(d), this court's review is
confined to the amended complaint, the answer and any attached
exhibits.  Fed.R.Civ.P. 12(d); <u>see</u> Fed.R.Civ.P. 10(c) ("a written
instrument that is an exhibit to a pleading is part of the
pleading for all purposes").  In evaluating a Rule 12(c) motion,
a court may "consider 'documents the authenticity of which are
not disputed by the parties'" as well as "'documents central to
the plaintiffs' claim'" and "'documents sufficiently referred to
in the complaint.'"  <u>Curran v. Cousins</u>, 509 F.3d 36, 44 (1st Cir.
2007).  When a complaint sufficiently refers to a document or the
facts in the complaint are dependent upon a document offered by
the movant, the document merges into the pleadings as long as the
authenticity of the document is not challenged.  <u>See</u> <u>Beddall v.
State Street Bank and Trust Co.</u>, 137 F.3d 12, 17 (1st Cir. 1998)
("When, as now, a complaint's factual allegations are expressly
linked to-and admittedly dependent upon—a document [offered by
the movant] (*the authenticity of which is not challenged*), that
document effectively merges into the pleadings and the trial

---

[4]  In the case at bar, the answer includes a number of
affirmative statements, albeit none that warrant allowing the
Rule 12(c) motion.

court can review it" in deciding Rule 12(b)(6) motion) (emphasis added); accord Curran v. Cousins, 509 F.3d at 44 (quoting Beddall, 137 F.3d at 17, and applying it to Rule 12(c) motion).

It is therefore debatable whether a court can consider the exhibits attached to a complaint in the context of a plaintiff's Rule 12(c) motion where, as here, the non-moving party challenges the authenticity of the exhibits.  See Curran v. Cousins, 509 F.3d at 44 n.5.  Nevertheless, it is not necessary to resolve the issue because, even considering the exhibits attached to the SAC, five of which duplicate those attached to the motion (Docket Entry ## 84-4, 84-5, 84-6, 84-7, 84-8), plaintiff's Rule 12(c) motion is devoid of merit.  As explained below in greater detail, Polyvore's answer objects to the majority of the facts in the amended complaint and the exhibits themselves (Docket Entry ## 52-1 to 52-13), which are prefaced by legal conclusions as opposed to facts, do not provide a basis for a judgment on Count I in plaintiff's favor.

As to the remaining three exhibits which are not attached to the SAC (Docket Entry ## 84-1, 84-2, 84-3), Polyvore likewise objects to their consideration given their lack of authenticity. The three exhibits consist of snapshots of Polyvore's website at certain times that inter alia purportedly contain images of the Chameleon and other copyrighted works as well as instructions about cropping and uploading images, modifying or removing

background images and posting an image or set of images to a
user's blog.  Polyvore points out that two of the three exhibits
contain colored arrows, underlining and similar markings such as
asterisks purportedly added by plaintiff.[5]  (Docket Entry ## 84-
1, 84-3).  Polyvore accurately notes that all three exhibits are
snapshots of websites in August 2014, February 2015, March 2015
and April 2015.  In addition to objecting on the basis of
authentication, Polyvore argues that the exhibits are not
incorporated in or part of the SAC.  (Docket Entry # 84-1, 84-2,
84-3).

Authentication requires "proof that a document or thing is
what it purports to be . . .."  Yongo v. I.N.S., 355 F.3d 27, 30-
31 (1ˢᵗ Cir. 2004); Fed.R.Evid. 901(a).  None of the exhibits are
certified copies of public records, see Fed.R.Evid. 902(4), or
otherwise fall within the categories of self authenticating
documents under Fed.R.Evid. 902.  See United States v. Hatchett,
245 F.3d 625, 643-645 & n.7 (7ᵗʰ Cir. 2001).  They are also
extraneous to the SAC and answer and, accordingly, unless they
fall within one of the narrow exceptions that allow this court to
consider them, they are not part of the Rule 12(c) record.

Plaintiff relies on judicial notice and admissions as a

---

[5]  Plaintiff replies that the superimposed markings preserve
the record and illustrate his arguments.  (Docket Entry # 94).
Plaintiff invites this court to go to the website to verify the
exhibits and "see how" various functions "work on line."  (Docket
Entry # 85, pp. 10-11) (Docket Entry # 94, p. 17).  This court
declines the invitation to engage in such ex parte discovery and
independent fact finding.

means to include the exhibits in the record.  Addressing the
former, it is well settled that a court may consider "facts
susceptible to judicial notice" without converting a Rule 12(c)
motion to a summary judgment motion.  <u>R.G. Financial Corp. v.
Vergara-Nunez</u>, 446 F.3d at 182.  "Under Fed.R.Evid. 201(b), a
judge may take notice of an adjudicative fact only if it is 'not
subject to reasonable dispute in that it is either (1) generally
known within the territorial jurisdiction of the trial court or
(2) capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned.'"
<u>Lussier v. Runyon</u>, 50 F.3d 1103, 1113 (1st Cir. 1995).  Although
courts may "take judicial notice of federal agencies' websites
and the information on them," <u>In re Poirier</u>, 346 B.R. 585, 588
(Bankr.D.Mass. 2006); <u>see Gent v. CUNA Mutual Insurance Society</u>,
611 F.3d 79, 84 n.5 (1st Cir. 2010); <u>Hill v. Capital One Bank
(USA), N.A.</u>, 2015 WL 468878, at *5 (N.D.Ill. Feb. 3, 2015), the
exhibits at issue purport to be snapshots of Polyvore's website
with enlargements and arrows created by plaintiff as opposed to a
government agency's website.  In addition, Polyvore disputes
their authenticity and reasonably questions their accuracy.  As
such, they are not subject to judicial notice for purposes of the
Rule 12(c) motion.[6]  <u>See CrossFit, Inc. v. Alvies</u>, 2014 WL

_____

[6]  This court expresses no opinion on whether to take
judicial notice of the exhibits if Polyvore did not dispute their
accuracy and authenticity.  Separately, plaintiff's reliance on
cases outside the First Circuit is misplaced.  The decision in

251760, at *2 (N.D.Cal. Jan. 22, 2014) ("unclear why the Court should take judicial notice of Facebook's internal compliance procedures" because it is "not a fact that 'is generally known within the trial court's jurisdiction,' or that 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned'").

Plaintiff next argues that the United States District Court for the Southern District of New York ("New York court") took judicial notice of the same document at the same uniform resource locator ("URL") address on Polyvore's website contained on page three of exhibit HH in this case (Docket Entry # 84-3, p. 3). Plaintiff attaches two pages of the unpublished decision to the reply memorandum.  (Docket Entry # 94-1).  The New York court took judicial notice of a screen shot titled, "How Can I Get My Copyrighted Images Removed from Polyvore?"  (Docket Entry # 94-

_____

Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc., 220 F.Supp.2d 289 (S.D.N.Y. 2002), is distinguishable because the court took "judicial notice of the content of the web sites, all of which are incorporated by reference into Marvel's counterclaims." Id. at 296 n.9.  Here, the three exhibits are not incorporated by reference into the SAC.  In addition, the subject of judicial notice in O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1224 (10th Cir. 2007), "the actual earnings history on Northrop Grumman's website," differs from the screen shots on specific days with enlargements created by plaintiff. In another case cited by plaintiff, Caldwell v. Caldwell, 420 F.Supp.2d 1102, 1105 n.3 (N.D.Cal. 2006), there was little, if any, indication that the opposing party questioned the accuracy of the website.  Similarly, the opposing party did not object or dispute the websites at issue in Richards v. Cable News Network, Inc., 15 F.Supp.2d 683, 691 (E.D.Pa. 1998), also cited by plaintiff.

1).  The same exhibit here with the same caption includes the
statement that, "Polyvore takes copyright issues very seriously.
If you find your copyrighted images on Polyvore and don't want
them there, please let us know and we will take them down within
1 business day." (Docket Entry # 84-3, p. 3).  Plaintiff
therefore submits that Polyvore has a practice of removing
copyrighted images within one day of receiving notice and defines
"expeditiously" under the DMAC as one day.  Whereas this court
will assume for purposes of argument that judicial notice is
appropriate of this page, it does not advance plaintiff's cause.
As noted below, the record establishes that Polyvore removed the
purportedly copyrighted images upon receiving a DMCA notice from
plaintiff.[7]

A number of the purported admissions plaintiff identifies
are likewise outside the Rule 12(c) record.  For example, it is
improper to consider the declaration (Docket Entry # 43) in the
course of reviewing the Rule 12(c) motion.  <u>See</u>, <u>e.g.</u>, <u>Moss v.
Martin</u>, 2005 WL 4717594, *2 (C.D.Ill. May 16, 2005) ("Moss
Affidavit is not a part of the pleadings under Rule 10(c) because
it was not presented as an exhibit to either the Complaint or the
Answer" and is therefore not part of Rule 12(c) record).  The
declaration (Docket Entry # 43) is neither part of the pleadings
nor attached to it as an exhibit.  <u>See</u> <u>generally</u> <u>Rose v. Bartle</u>,

---

[7]  See footnote nine and related text.

871 F.2d 331, 340 (3rd Cir. 1989).  Likewise, the unsworn

statements in a prior memorandum cited by plaintiff (Docket Entry

# 85, pp. 9-10, ¶ 3) are also extraneous to the pleadings and do

not fall into any recognized exception.

Having set out the scope of the record, the record includes

the following facts viewed in Polyvore's favor.

<u>FACTUAL BACKGROUND</u>[8]

Wolk, a professional artist for the last 40 years, is

"considered one the leading fantasy artists in the world."

(Docket Entry # 52-2, Ex. AA, ¶ 2).  On September 10, 2012, she

executed a Copyright Assignment ("the assignment") assigning to

plaintiff "all copyrights and property rights" to "the Art Images

listed" in an attached exhibit.  (Docket Entry # 52-2, Ex. AA, p.

3).  As stated in the assignment, Wolk:

> *exclusively*, absolutely and unconditionally and irrevocably
> assigns, transfers, sets over, and conveys to <u>Robert H.
> Sarvis</u> . . . ("Assignee") all of Sheila Wolk's right, title,
> and interest throughout the universe in and to that certain
> original material referred to as the Art Images listed and
> described in <u>Exhibit A</u> attached hereto, including, without
> limitation, the copyrights therein in the United States of
> America, and *all copyrights and property rights therein* and
> elsewhere throughout the universe, and further including
> without limitation any and all versions of said Art Images
> and all copyrights in such other versions . . ..  The rights
> hereby granted to the Assignee *include, without limitation*,
> the right to do any and all acts or things necessary or
> appropriate to protect the rights granted hereunder,
> including the copyrights, and to institute any actions for

---

[8]  Citations to the record are provided only for direct
quotations.  Page numbers refer to the page as docketed as
opposed to the page number of the document itself.

such purpose in the name of the Assignee, Assignor, or both
of them.

(Docket Entry # 52-2, Ex. AA, p. 3) (emphasis added and bolding

omitted). The assignment included a "Reversion of Rights" which

reads as follows:

> The above assignment will revert to Sheila Wolk under the
> following circumstances:
> 1) The Line of Credit is paid in full including as interest
> due; and
> 2) The Line of Credit is terminated by Robert Sarvis or
> Sheila Wolk; and
> 3) A one time payment by Sheila Wolk to Robert Sarvis of
> $1,000.00.

(Docket Entry # 52-2, Ex. AA, p. 3).

The list of 22 assigned art images includes Chameleon, Field

of Dreams and Gatekeeper. All of the 22 assigned art images are

registered with the United States Copyright Office.

Polyvore is a service provider and maintains a "website

located at 'www.polyvore.com.'" (Docket Entry # 83, ¶ 76). The

company "has been referred to as a 'fashion community'" and also

allows users of the website to access editing tools to crop and

combine images to create their own "'sets' of images on the

website." (Docket Entry # 83, ¶¶ 44, 58, 62).

By letter dated October 12, 2012, plaintiff notified

Polyvore's registered agent that both Polyvore and its users were

copying and displaying copyrighted works of Wolk assigned to

plaintiff ("the DMCA notice" or "the notice"). The notice

identified 20 art images that Polyvore and its users purportedly

14

infringed by copying and displaying images of the art on Polyvore's website ("the copyrighted works"). The notice set out the location of each infringing document by providing one or more URLs designating the location on Polyvore's website. The notice described the URL addresses as "a representative list of" the URLs associated with the infringed art images that are copied and displayed on the Polyvore website. (Docket Entry # 52-4). Plaintiff signed the notice, provided his address and included a statement that he had a "good faith belief that" the use infringed the copyrighted works. (Docket Entry # 52-4). Polyvore does not have a license to copy or display the Wolk images.

Construing the record in Polyvore's favor, the company "removed [the] purportedly copyrighted images from its website upon receiving" the DMCA notice. (Docket Entry # 83, ¶ 22). Polyvore denies that it failed to take down an image of Chameleon at the URL address identified in the DMCA notice and that the image remained on the website as of January 29, 2013. (Docket Entry # 83, ¶ 21) (Docket Entry # 52-8). It also denies that an August 26, 2013 search on the Polyvore website by plaintiff yielded a number of images of the registered works, including Gatekeeper.[9] (Docket Entry # 83, ¶ 22) (Docket Entry # 52-12).

---

[9] In light of the above, plaintiff's theory that Polyvore did not take down images in response to the DMCA notice and that images remained on the website as of January 29 and August 26,

As an internet service provider, Polyvore featured 57,816,040 sets created by Polyvore users as of August 2012. Monthly visitors to the website during August 2012 totaled 17,717,928.  Users can create accounts on the website and use a "'Clipper' tool" at no charge.  (Docket Entry # 83, ¶¶ 58, 62). The "editing tool allows users to crop images" and Polyvore's software can "make the background color of an image transparent." (Docket Entry # 83, ¶ 65).  Polyvore denies that users employ editing tools that remove or hide copyright watermarks.  It also denies that the images in exhibit K, including the image of Siren Song, provide examples and descriptions of an automatic formatting function.[10]  (Docket Entry # 83, ¶ 65) (Docket Entry # 52-13).

When Polyvore users create sets using the company's editing tools, the sets may "contain hyperlinks to the websites of third parties." (Docket Entry # 83, ¶ 42).  A user can also place copies of images on his or her user page.  In addition, Polyvore users can conduct keyword searches with a search function on the website.  Polyvore denies that a search for "fairy" on its website yields a high resolution image of Gatekeeper.  (Docket Entry # 83, ¶ 87) (Docket Entry # 52-10).

---

2013, is misguided.

[10]  In light of these and other denials by Polyvore in its answer to the SAC, plaintiff's position that Polyvore's automatic formatting establishes direct copying is unavailing.

When a user performs a search, the results may produce images under categories of "'[y]ou might also like'" and "'more items & looks.'" (Docket Entry # 83, ¶ 57). Polyvore denies that screen shots of various images on its website showed images of one or more of the 22 registered art images, including Gatekeeper and Field of Dreams. (Docket Entry # 83, ¶¶ 82, 89) (Docket Entry ## 52-7, 52-11).[11] The company also denies that it stores images of the registered works in a searchable database on the website. (Docket Entry # 83, ¶ 55).

Polyvore runs regularly occurring contests on its website for Polyvore users. A number of the contests offer prizes. During the contests, users create sets using Polyvore's editing tools and other software and then enter the sets into the contest. Under Polyvore rules and regulations applicable to these contests, users represent that their entries are original as opposed to copies taken from other third parties. (Docket Entry # 52-5). Polyvore and/or an outside underwriting entity judge the entries and award the prizes. Polyvore publishes the list of winners and displays the winning sets to the public.

Polyvore receives fees and revenue from the contests. The company also earns revenue from retailers or manufacturers when a

---

[11] Because Polyvore's answer denies the facts in these paragraphs, including the exhibits, plaintiff's attempt to use these "facts" and images to establish direct infringement via direct copying or the formatting system on a Rule 12(c) motion is unavailing.

Polyvore user or visitor clicks through hyperlinks and enters the retailers' or manufacturers' websites or makes purchases on the websites accessed through the hyperlinks.

Polyvore's chief executive officer, Jess Lee ("Lee"), is a Polyvore user and creates sets on the website.  She also belongs to a Polyvore group involved in fantasy art.  Polyvore denies that the group copied and displayed an image of Gatekeeper. (Docket Entry # 83, ¶ 32) (Docket Entry # 52-6).  Before joining the company in 2008, "Lee was a product manager at Google." (Docket Entry # 83, ¶ 30).  Pasha Sadri ("Sadri"), a co-founder of Polyvore, was a software engineer at Yahoo before joining Polyvore.  She holds at least one patent in search technology.

<u>DISCUSSION</u>

Plaintiff contends that the facts justify judgment on the pleadings on the direct infringement claim and emphasizes Polyvore's infringement of the art images of Chameleon, Gatekeeper and Field of Dreams.  Plaintiff submits that a number of factual findings made by this court in resolving Polyvore's motion to dismiss establish facts that support the direct infringement claim.  In addition to providing examples of images on the website that purportedly infringe the copyrighted art images, plaintiff asserts that the automatic formatting and "as you like it" features on the website proximately cause the display of copyrighted images.  Plaintiff also points out that

Polyvore did not remove an image of Gatekeeper from the website for at least 66 days after the DMCA notice and that images remained on the website as of August 26, 2013.  Plaintiff argues that Polyvore's defenses, including the DMCA and fair use, do not avoid a judgment on the pleadings on Count I.

Polyvore maintains, correctly, that in light of the denials in its answer and plaintiff's reliance on exhibits outside the Rule 12(c) record (Docket Entry ## 82-1, 82-2, 82-3), a judgment in plaintiff's favor on Count I is not appropriate.[12]  It also relies on the fair use defense and the DMCA as a means to avoid a Rule 12(c) judgment on Count I.  Polyvore asserts that it is not liable for direct infringement based on the non-volitional conduct performed by its automated software.

Count I raises a claim of direct infringement.  To prevail on such a claim, the plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991); Society of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 39 (1st Cir. 2012).  The second element requires a showing of both factual copying, either by direct or circumstantial evidence, and substantial similarity.  Society of the Holy Transfiguration

_____

[12]  As previously explained, the above exhibits are excluded from the record except for one of the pages (Docket Entry # 84-3, p. 4).

Monastery, Inc. v. Gregory, 689 F.3d at 48-49.  Substantial
similarity occurs when "the copying was so flagrantly extreme
that the allegedly infringing and copyrighted works were, for all
intents and purposes, '"substantially similar."'"  Id. at 48
(quoting Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC,
259 F.3d 25, 33 (1st Cir. 2001)).

In the answer, Polyvore denies that it displayed any images
of the copyrighted works.  It also denies that various searches
yielded images of any of the copyrighted art images.  Upon
receiving the DMCA notice, Polyvore removed the purportedly
copyrighted images from its website.  The answer denies that
Polyvore users remove copyright watermarks and that Polyvore
stores art in high resolution images.  In light of Polyvore's
denials and its affirmative statements in the answer, the Rule
12(c) record does not establish factual copying or substantial
similarity.

The fair use defense provides an alternative basis to avoid
a judgment on the pleadings in plaintiff's favor on Count I.  The
defense, codified in 17 U.S.C. § 107, balances and weighs four
factors "together in light of the purposes of copyright,"
Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994), to
decide "whether use of a work is fair or infringing."  Society of
Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 59.
The four, non-exclusive factors are "the purpose and character of

a work's use, the nature of the copied work, the extent of the copying, and its effect on a work's market value."   Id.; 17 U.S.C. § 107.

The third factor weighs strongly and firmly in Polyvore's favor.  The Rule 12(c) record shows no wholesale copying and little, if any, more limited copying of a smaller portion of a copyrighted art images or a smaller quantity of a copyrighted art image.  See generally Society of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 62-63.  Plaintiff's contention that Polyvore copied 100% of Chameleon is incorrect.  Polyvore denied that a copyrighted image of Chameleon remained on the website as of January 29, 2013.  Polyvore also removed any "purportedly copyrighted images from its website upon receiving" the DMCA notice.  (Docket Entry # 83, ¶ 22).  In short, the record fails to exhibit that Polyvore copied any appreciable portion or significant aspect of a copyrighted art image.

Similarly, because of Polyvore's denials in the answer, the record belies any significant copying of the copyrighted art images.  Consequently, the degree of market harm, part of the fourth factor, is de minimus.  Likewise and again in light of the denials, widespread conduct of the kind engaged in by Polyvore would have little impact on the potential market for the copyrighted works.  The fourth factor thus weighs substantially in Polyvore's favor.

21

The second factor favors plaintiff.  The copyrighted works
are in the realm of fantasy art and therefore creative in nature.
The record, however, fails to indicate the previous publication
of the copyrighted works.  The first factor remains relatively
neutral because the Rule 12(c) record contains little information
about the purpose and character of the use of any copyrighted
works by Polyvore or its users.  On balance and weighing all of
the factors based on the facts in the Rule 12(c) record, Polyvore
presents a plausible defense that its use of the copyrighted art
images, if any, was fair.

Finally, plaintiff's reliance on findings made by this court
in the March 2015 Report and Recommendation is misguided.  The
opinion addressed *Polyvore's* motion to dismiss and viewed the
record in *plaintiff's* favor.  These differences lead to a
different factual record.  For example, this court's prior
finding that the Rule 12(b)(6) facts support a finding that
Polyvore "failed expeditiously to remove" infringing material on
its website (Docket Entry # 75, p. 28) does not mean that, when
viewing the record in Polyvore's favor under a different set of
facts, Polyvore did not expeditiously remove the Chameleon image
identified in the DMCA notice, as asserted by plaintiff (Docket
Entry # 85, p. 10).  In sum, plaintiff fails to show that the
pleadings entitle it to judgment in its favor on Count I.

II.  <u>Polyvore's Rule 12(c) Motion</u>

Polyvore submits that the assignment, including the reversion of rights, the admissions plaintiff made in the SAC and the DMCA notice preclude his standing to bring an action under the Copyright Act because he is not the owner of the copyrights. Polyvore maintains that plaintiff is only a creditor and that Wolk owns the copyrights that serve as the collateral for a line of credit.  It further asserts that the assignment is similar to the assignments at issue in Righthaven LLC v. Hoehn, 716 F.3d 1166 (9th Cir. 2013); Righthaven LLC v. Newman, 838 F.Supp.2d 1071 (D.Nev. 2011); Righthaven LLC v. Wolf, 813 F.Supp.2d 1265 (D.Colo. 2011); Righthaven LLC v. Pahrump Life, 2011 WL 7442981 (D.Nev. Aug. 12, 2011); Righthaven LLC v. Democratic Underground, LLC, 791 F.Supp.2d 968 (D.Nev. 2011), "which purported to convey a right to sue, but failed to confer ownership."  (Docket Entry # 92).

Plaintiff contends that the language of the September 2012 assignment differs from the language in the Righthaven agreements.  Plaintiff additionally points out that Polyvore did not include standing as an affirmative defense in the answer to the SAC and did not object to the March 2015 Report and Recommendation on the basis of standing.[13]  Plaintiff therefore argues that Polyvore waived the defense of standing.

_____

[13]   The opinion noted that, "At present, Polyvore does not maintain that Count I fails because plaintiff does not own the copyrighted works."  (Docket Entry # 75, p. 13).

Because Polyvore seeks dismissal under Rule 12(c), it is not necessary to repeat the standard of review except to note that the record is viewed in plaintiff's favor and the facts in the SAC are treated as true.[14]  Thus, "[T]o survive a Rule 12(b)(6) motion (and, by extension, a Rule 12(c) motion) a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'"  Perez-Acevedo v. Rivero-Cubano, 520 F.3d at 29 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

As pointed out by Polyvore (Docket Entry # 92, p. 15), the

---

[14]  Although Polyvore's supporting memorandum briefly refers in passing to Rule 12(b)(1) (Docket Entry # 92, p. 19), it repeatedly describes the argument as seeking a "judgment on the pleadings" and cites to Rule 12(c).  (Docket Entry # 92).  The motion identifies only Rule 12(c).  (Docket Entry # 89).

In any event, the applicable standard under Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)") is similar to the standard under Rule 12(c) because it requires the court to "credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor."  Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010) (citing Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001)); Sanchez ex rel. D.R.-S. v. U.S., 671 F.3d 86, 92 (1st Cir. 2012) ("'credit[ing] the plaintiff's well-pled factual allegations and draw[ing] all reasonable inferences in the plaintiff's favor'" under Rule 12(b)(1)).  Unlike Rule 12(c), however, "The district court may also 'consider whatever evidence has been submitted, such as the depositions and exhibits submitted.'"  Merlonghi v. United States, 620 F.3d at 54 (quoting Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)).  Consideration of the additional exhibits and declaration (Docket Entry # 43), however, does not lead to a different result.  In other words, under a Rule 12(b)(1) standard, this court would arrive at the same recommended ruling on Polyvore's motion.

SAC states that:  (1) "Robert Sarvis is the assignee of certain copyrights of the art of Sheila Wolk"; (2) "[T]he assignment was made as secured collateral for a line of credit granted by Sarvis to Wolk"; and (3) "As a result of the assignment[,] the Plaintiff has[,]" among other rights, the "right to initiate copyright infringement actions to protect his collateral." (Docket Entry # 52, ¶¶ 6, 11, 12).  Polyvore additionally relies on language in the DMCA notice which states that:  (1) "Polyvore . . . and its Internet Users" continue to copy "the registered art of Sheila Wolk without authorization in violation of her copyrights"; (2) plaintiff is "authorized to act on behalf of the copyright owner, Sheila Wolk"; and (3) plaintiff "has a good faith belief that" Polyvore's use "is not authorized by the copyright owner, Sheila Wolk." (Docket Entry # 52-4) (Docket Entry # 92, p. 17).

In addition to the foregoing and the above language of the assignment, plaintiff attached an affidavit by Wolk to the SAC. In the affidavit, Wolk attests to the accuracy of the September 2012 assignment and describes it as an "assignment of twenty-two of my works and copyrights related to those works to Robert H. Sarvis." (Docket Entry # 52-2).  Wolk signed the affidavit on August 29, 2013, approximately a year after the assignment, nine months after plaintiff filed suit and more than six months after Polyvore first challenged plaintiff's standing.  Accordingly, it is of minimal relevance to the intent of the parties at the time

of the assignment.[15]  See generally Righthaven LLC v. Hoehn, 716
F.3d at 1171.  The language of the assignment provides the focal
point of the analysis.  Familiarity with the record is presumed
in light of the summary of facts in the SAC set out in the March
2015 Report and Recommendation.

DISCUSSION

Under the language of section 501(b) of the Copyright Act,
"only 'the legal or beneficial owner of an exclusive right under
a copyright is entitled . . . to institute an action for any
infringement of that particular right committed while he or she
is the owner of it.'"  Motta v. Samuel Weiser, Inc., 768 F.2d
481, 483-84 (1st Cir. 1985); see Latin American Music Co. v. The
Archdiocese of San Juan of Roman Catholic & Apostolic Church, 499
F.3d 32, 41 (1st Cir. 2007) (non-exclusive licensees lacked
standing to bring infringement claim because they were not legal
or beneficial owners of an exclusive right).  Only the owner of
the copyright or "the owner of exclusive rights under the
copyright, as of the time the acts of infringement occur, has
standing to bring an action for infringement of such rights."  3
Melville Nimmer & David Nimmer, Nimmer on Copyright § 12.02[C]
(2015).  Absent a showing that plaintiff is a legal or beneficial
owner of an exclusive right, he lacks standing to bring this

---

[15]  In any event, excluding the affidavit from the record,
the result remains the same.

action.   See Latin American Music Co. v. The Archdiocese of San
Juan of Roman Catholic & Apostolic Church, 499 F.3d at 42
(section 501(b) "accords standing only to the legal or beneficial
owner of an 'exclusive right'").

Section 106 of the Copyright Act defines the exclusive
rights as the right "to reproduce the copyrighted work," "to
prepare derivative works based upon the copyrighted work," "to
distribute copies" for sale to the public and "to display the
copyrighted work publicly."  17 U.S.C. § 106; see Society of Holy
Transfiguration Monastery, Inc. v. Gregory, 689 F.3d at 54.
Because the right to sue is not one of the listed exclusive
rights, the Ninth Circuit in Righthaven LLC v. Hoehn, 716 F.3d at
1169, and in Silvers v. Sony Pictures Entertainment, Inc., 402
F.3d 881, 890 (9th Cir. 2005) (en banc), conclude that, an
"assignment of the bare right to sue for infringement, without
the transfer of an associated exclusive right, is impermissible
under the Copyright Act and does not confer standing to sue."
Righthaven LLC v. Hoehn, 716 F.3d at 1169 (summarizing holding in
Silvers v. Sony Pictures Entertainment, Inc., 402 F.3d at 890).
Finally, under 17 U.S.C. § 201(d)(1), "The ownership of a
copyright may be transferred in whole or in part" and under
section 201(d)(2), "Any of the exclusive rights . . . may be
transferred as provided" in section 201(d)(1).  17 U.S.C. §
201(d); see Automation By Design, Inc. v. Raybestos Products Co.,

27

463 F.3d 749, 753 (7th Cir. 2006) ("rights comprised in a copyright may be subdivided and transferred"; citing 17 U.S.C. 201(d)(2)).

Principles of state contract law apply to the construction of an assignment that purportedly transfers an exclusive right of the copyright owner where, as here, there is no conflict with federal policy.  See <u>Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.</u>, 716 F.3d 302, 313 (2nd Cir. 2013) (construing agreement "according to state law principles of contract interpretation, even though the subject matter of the Agreement concerns issues of federal copyright law"); <u>Close-Up Intern., Inc. v. Berov</u>, 2010 WL 2588218, at *2 (2nd Cir. June 29, 2010) ("alleged transfer of copyright is subject to requirements for a valid transfer under copyright law but is also governed by state contract law") (unpublished); <u>Foad Consulting Group, Inc. v. Azzalino</u>, 270 F.3d 821, 827 (9th Cir. 2001); <u>Kennedy v. National Juvenile Detention Association</u>, 187 F.3d 690, 694 (7th Cir. 1999) ("[n]ormal rules of contract construction are generally applied in construing copyright agreements"); <u>Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.</u>, 128 F.3d 872, 880 (5th Cir. 1997) (to the extent "not inconsistent with the Copyright Act and its policies, Texas law governs our analysis of whether the parties contractually created a nonexclusive license"); <u>Fantastic Fakes, Inc. v. Pickwick International, Inc.</u>, 661 F.2d 479, 483

(5th Cir. 1981) (same); <u>Tempest Pub., Inc. v. Hacienda Records</u>
<u>and Recording Studio, Inc.</u>, 2015 WL 1246644, at *2 (S.D.Tex.
March 18, 2015) ("[s]tate contract law governs the construction
of copyright assignments, licenses, and other writings effecting
transfers of intellectual property"); <u>Righthaven LLC v. Newman</u>,
838 F.Supp.2d at 1074 ("although the act grants exclusive
jurisdiction for infringement claims to federal courts, those
courts construe copyrights as contracts and turn to the relevant
state law to interpret them"); 3 Melville Nimmer & David Nimmer,
<u>Nimmer on Copyright</u> § 10.08[A] (2015) ("principles of contract
law generally apply to construction of copyright assignments,
licenses, and other transfers of rights").  The assignment
agreement expressly identifies Wolk as located in New York and
plaintiff as located in Massachusetts.  No other state has a
sufficient connection to the contract to warrant considering the
application of its laws to the agreement.  Because the
application of either Massachusetts or New York law does not
alter the result, it is not necessary to decide the body of law
that applies.  <u>See</u> <u>Jasty v. Wright Medical Technology, Inc.</u>, 528
F.3d 28, 34 (1st Cir. 2008) (recognizing that court need not
resolve choice of law if the issue does not alter the disposition
of a legal question law).

Massachusetts and New York law look to the language of an
agreement to determine the parties' intent and apply traditional

rules of contract construction.  <u>See</u> <u>Luitpold Pharmaceuticals,</u>
<u>Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie</u>, 784
F.3d 78, 87 (2nd Cir. 2015); <u>Barclays Bank PLC v. Poynter</u>, 710
F.3d 16, 21 (1st Cir. 2013).  Under New York law, "'a contract is
to be construed in accordance with the parties' intent, which is
generally discerned from the four corners of the document
itself.'"  <u>Luitpold Pharmaceuticals, Inc. v. Ed. Geistlich Söhne</u>
<u>A.G. Für Chemische Industrie</u>, 784 F.3d at 87.  Reading "the
contract as a whole," <u>id.</u>, "the words and phrases in a contract"
are "given their plain meaning."  <u>Chesapeake Energy Corp. v. Bank</u>
<u>of New York Mellon Trust Co., N.A.</u>, 773 F.3d 110, 114 (2nd Cir.
2014) (internal brackets omitted).  "A contract is ambiguous when
'[r]easonable minds could differ' as to its meaning."  <u>Luitpold</u>
<u>Pharmaceuticals, Inc. v. Ed. Geistlich Söhne A.G. Für Chemische</u>
<u>Industrie</u>, 784 F.3d at 87.  If an ambiguity exists, a court may
"look to extrinsic evidence to discern the parties' intent."
<u>Luitpold Pharmaceuticals, Inc. v. Ed. Geistlich Söhne A.G. Für</u>
<u>Chemische Industrie</u>, 784 F.3d at 87.

Similarly, under Massachusetts law, contracts "are
interpreted according to their plain terms."  <u>Barclays Bank PLC</u>
<u>v. Poynter</u>, 710 F.3d at 21 (applying Massachusetts law).  "When
the words of a contract are clear, they must be construed in
their usual and ordinary sense."  <u>General Convention of New</u>
<u>Jerusalem in the United States of America, Inc. v. MacKenzie</u>, 874

N.E.2d 1084, 1087 (Mass. 2007); <u>accord</u> <u>Barclays Bank PLC v.</u>
<u>Poynter</u>, 710 F.3d at 21.  Words are not taken in isolation but
rather "within the context of the contract as a whole." <u>Barclays</u>
<u>Bank PLC v. Poynter</u>, 710 F.3d at 21.  In determining the
existence of an ambiguity, the court examines "'the language of
the contract by itself, independent of extrinsic evidence
concerning the drafting history or intention of the parties.'"
<u>Barclays Bank PLC v. Poynter</u>, 710 F.3d at 21 (quoting <u>Bank v.</u>
<u>Thermo Elemental Inc.</u>, 888 N.E.2d 897, 907 (Mass. 2008)).  In the
event of an ambiguity, a court may examine extrinsic evidence.
<u>General Convention</u>, 874 N.E.2d at 1087; <u>see</u> <u>Young v. Wells Fargo</u>
<u>Bank, N.A.</u>, 717 F.3d 224, 231-232, 237 (1st Cir. 2013).
"[E]xtrinsic evidence cannot be used to contradict or change the
written terms, but only to remove or to explain the existing
uncertainty or ambiguity." <u>General Convention</u>, 874 N.E.2d at
1087.  Language is ambiguous when "'it is susceptible of more
than one meaning and reasonably intelligent persons would differ
as to which meaning is the proper one.'" <u>Barclays Bank PLC v.</u>
<u>Poynter</u>, 710 F.3d at 21; <u>see</u> <u>Bank v. Thermo Elemental Inc.</u>, 888
N.E.2d at 907 ("'[c]ontract language is ambiguous "where the
phraseology can support a reasonable difference of opinion as to
the meaning of the words employed and the obligations
undertaken"'").

     For purposes of standing, the issue reduces to whether Wolk

transferred ownership of one or more exclusive rights to plaintiff under the assignment.  At the outset, the assignment uses broad language under which Wolk "exclusively, absolutely and unconditionally and irrevocably assigns, transfers, sets over, and conveys to" plaintiff "all of" her "right, title, and interest throughout the universe in and to that certain original material referred to as the Art Images listed and described in Exhibit A attached hereto, including, without limitation, the copyrights therein in the United States of America, and all copyrights and property rights therein . . .." (Docket Entry # 52-2) (underlining and bolding omitted).  "The rights" granted "*include*, *without limitation*, the right to . . . institute any actions." (Docket Entry # 52-2) (emphasis added).  The next paragraph states that the "assignment will revert to" Wolk if, inter alia, she pays plaintiff $1,000 or if either she or plaintiff terminates the line of credit.  (Docket Entry # 52-2). The language of the agreement as a whole therefore evidences the parties' intent to transfer "all copyrights and property rights" to plaintiff "exclusively" and for Wolk to have the ability to "revert" the assignment by paying the line of credit in full, making a payment of $1,000 to plaintiff or otherwise terminating the line of credit.  "[T]he rights granted" included "without limitation" the ability to institute a lawsuit.  Construing this language in its ordinary sense, the parties transferred the

32

copyrights and property rights to plaintiff exclusively
(including, but not limited to, the right to bring a lawsuit) and
gave Wolk the ability to revert the transfer back to her by
paying the line of credit in full or $1,000 or otherwise
terminating the line of credit.  The Rule 12(c) or 12(b)(1)
record therefore sufficiently establishes that plaintiff is the
owner of the copyrights to the art images listed in exhibit A of
the assignment.

Polyvore nevertheless submits that the language of the
assignment and, in particular, the right of reversion, is
materially indistinguishable from the language in the Righthaven
agreements.  The language in the Righthaven assignments "provided
that, 'subject to [Stephens Media's] rights of reversion,'
Stephens Media granted to Righthaven 'all copyrights requisite to
have Righthaven recognized as the copyright owner of the Work for
purposes of Righthaven being able to claim ownership as well as
the right to seek redress for past, present, and future
infringements of the copyright . . . in and to the Work.'"
Righthaven LLC v. Hoehn, 716 F.3d at 1168.  The assignments were,
however, subject to a previous agreement between the parties
stating that, "Despite any Copyright Assignment," the assignor
"shall retain . . . an exclusive license to Exploit the Publisher
Assigned Copyrights for any lawful purpose whatsoever and
Righthaven shall have no right or license to Exploit . . . other

33

than the right to proceeds in association with a Recovery."
<u>Righthaven LLC v. Wolf</u>, 813 F.Supp.2d at 1273 (third and fourth
emphasis added); <u>accord</u> <u>Righthaven LLC v. Hoehn</u>, 716 F.3d at
1168; <u>Righthaven LLC v. Democratic Underground, LLC</u>, 791
F.Supp.2d at 972.  The previous agreement gave the assignor the
ability to "revert the ownership of any assigned copyright back
to itself" by giving "Righthaven thirty days prior notice."
<u>Righthaven LLC v. Hoehn</u>, 716 F.3d at 1169.  Thus, under the prior
agreement, "Stephens Media *automatically* received an exclusive
license in any copyrighted work it assigned to Righthaven, so
that Stephens Media retained 'the unfettered and exclusive
ability' to exploit the copyrights."  <u>Id.</u> at 1170 (emphasis
added).  Meanwhile, Righthaven "had '*no right or license*' to
exploit the work or participate in any royalties associated with
the exploitation of the work" thereby leaving him "without any
ability to reproduce the works, distribute them, or exploit any
other exclusive right under the Copyright Act."  <u>Id.</u> (emphasis
added).  Left with only "the bare right to sue," Ninth Circuit
precedent, <u>Silvers v. Sony Pictures Entertainment, Inc.</u>, 402 F.3d
at 890 ("bare assignment of an accrued cause of action" does not
confer standing), dictated that Righthaven lacked standing.
<u>Righthaven LLC v. Hoehn</u>, 716 F.3d at 1169.

The Ninth Circuit in <u>Righthaven</u> also found that the prior
agreement unambiguously delineated the rights of Righthaven and

Stephens Media.  _Id._ at 1171.  It "evinced not just an intent that Righthaven receive whatever rights were necessary for it to sue, but also an intent that Stephens Media retained complete control over all exclusive rights."  _Id._  The court then addressed an amended agreement that made substantive changes to the prior agreement and purported to "clarify that the parties' intent in entering" into the prior agreement.  _Id._  The parties executed the amended agreement after Righthaven filed suit and the issue of standing arose.  _Id._  Even though the amended version removed the provision preventing Righthaven from exploiting the copyrights, under the amended version "Righthaven could only exploit a work if it gave Stephens Media thirty days prior notice.  And Stephens Media could ensure that Righthaven never actually exploited any assigned copyright, because it _retained_ the unilateral right to repurchase all rights and title back from Righthaven after giving fourteen days notice and paying a nominal sum of ten dollars."  _Id._ at 1172 (emphasis added).  Given these circumstances, the "hypothetical possibility" that Righthaven could exercise an exclusive right under the amended agreement was "not sufficient for standing."  _Id._

Here, there is no indication that Wolk and plaintiff entered into prior agreements that limited the rights granted to plaintiff under the assignment or automatically endowed Wolk with an exclusive license and ability to exploit the copyrights.

35

Rather, the language "exclusively, absolutely and
unconditionally" assigned and transferred "right, title, and
interest" to the art images, including "all copyrights and
property rights," to plaintiff.  (Docket Entry # 52-2).  Under
the assignment, Wolk did not retain any express rights and did
not limit the exercise of plaintiff's "unconditional[]"
assignment of "all copyrights and property rights."  (Docket
Entry # 52-2).  Unlike the language in the <u>Righthaven</u> agreements,
there was no indication that the parties intended to convey *only*
a right to sue.  Moreover, the language that the "assignment *will*
*revert*" if Wolk paid the line of credit, paid plaintiff $1,000 or
terminated the line of credit refers to an event that takes
place, if at all, after the transfer of the copyrights has
already occurred.  (Docket Entry # 52-2) (emphasis added).  In
short, under the agreement, Wolk transferred the copyrights and
property rights in the art images exclusively to plaintiff.
Wolk's right to obtain a reversion of the assignment does not
eviscerate the parties' expressed intent to transfer the
copyrights, but it does give her the ability to have the
copyrights revert, i.e., reconveyed, back to her if she paid
plaintiff $1,000, terminated the line of credit or paid the line
of credit in full.  Polyvore's analogy of plaintiff to a creditor
with a right to repayment and the copyrights as collateral that
"does not change hands" (Docket Entry # 92) is inapt because Wolk

36

transferred title to the copyrights and property rights to plaintiff.

In contrast, examining "the substance of the transaction," the Ninth Circuit in Righthaven interpreted the amended version in the context of the parties' prior agreement evincing their unambiguous intent that Stephens Media retain "complete control over all exclusive rights." Id. at 1170-1171. Overall, the changes in the amended agreement "made little practical difference to Righthaven's ability to exploit the copyrights." Id. at 1172. Stephens Media could shortcut any exercise by Righthaven to exploit the copyrights given the 30 day notice applicable to Righthaven and the 14 day notice applicable to Stephens Media. The Righthaven cases are therefore distinguishable based on the language of the agreements and the substance of the transactions.

In a related argument, Polyvore maintains that the copyright goals of predictability and certainty support finding that plaintiff lacks standing to be consistent with the materially indistinguishable Righthaven cases. Because of the above noted differences in the language of the agreements and the substance of the transactions, the argument is not convincing. Furthermore, this case does not involve the assignment of a mere right to sue and, accordingly, the same goals do not warrant a denial of standing. Cf. Silvers v. Sony Pictures Entertainment,

Inc., 402 F.3d at 890 (adhering to cases in other circuits to foster predictability and certainty and holding that the "bare assignment" of a right to sue does not confer standing).  In other words, considering these goals or federal policies embodied in the Copyright Act in interpreting the assignment, they do not lead to a different construction of the assignment.

In light of the above, it is not necessary to address plaintiff's alternative argument based on waiver.  That said, the standing at issue here is properly classified as an issue of statutory standing, i.e., defining the persons entitled to sue as those with a "legal or beneficial owner of an exclusive right," 17 U.S.C. § 501(b), rather than constitutional standing.  See generally Katz v. Pershing, LLC, 672 F.3d 64, 75 (1st Cir. 2012) (when "plaintiff alleges injury to rights conferred by a statute, two separate standing-related inquiries pertain: whether the plaintiff has Article III standing (constitutional standing) and whether the statute gives that plaintiff authority to sue (statutory standing)"); CoxCom, Inc. v. Chaffee, 536 F.3d 101, 107 n.7 (1st Cir. 2008) (distinguishing constitutional standing from "standing to sue as an 'aggrieved person' under Section 553 or as a 'person injured' under the DMCA"); Minden Pictures, Inc. v. John Wiley & Sons, Inc., 2014 WL 1724478, at *4-5 (N.D.Cal. April 29, 2014).  Statutory as opposed to constitutional standing is waivable.  See Merrimon v. Unum Life Insurance Co. of America,

758 F.3d 46, 53 n.3 (1st Cir. 2014).  Polyvore, however, raised

the issue of standing by motion in lieu of an answer to the

original complaint (Docket Entry # 16) and reasserts it in the

pending motion (Docket Entry # 89).

<u>CONCLUSION</u>

In accordance with the foregoing discussion, it is

**RECOMMENDED**[16] that Polyvore's motion for judgment on the

pleadings (Docket Entry # 89) and plaintiff's motion for partial

judgment on the pleadings (Docket Entry # 84) be **DENIED**.  This

court will conduct a status conference on September 23, 2015, at

3:00 p.m. to set a discovery schedule.

  /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[16] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Fed.R.Civ.P. 72(b).  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.